U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    DEC 11 2003

LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ROBERT ANDREW PARISH** | **CIVIL ACTION** |
| **VERSUS** | **NO. 02-2655** |
| **HARRY LEE, ET AL.** | **SECTION "R" (4)** |

## SECOND AMENDED COMPLAINT

Plaintiff Robert Andrew Parish, appearing through undersigned counsel, hereby amends and supplements his original *pro se* complaint as follows:

## I. JURISDICTION

1.

This action is brought pursuant to 42 U.S.C. § 1983 for claims arising under the Eighth and Fourteenth Amendments to the Constitution of the United States. Jurisdiction of this Court is conferred pursuant to 28 U.S.C. §§ 1331, 1332, 1343, 2201, 2202. The pendant jurisdiction of this Court is conferred over claims arising under the laws of the State of Louisiana pursuant to 28 U.S.C. § 1367 for claims pursuant to LSA-C.C. Art. 2315 et seq.

## II. PARTIES

2.

Plaintiff Robert Andrew Parish is an adult citizen of the United States residing in Soso, Mississippi. At all times relevant to this complaint he was incarcerated at Jefferson Parish Correctional Center ("JPCC") in Gretna, Louisiana.

Fee_____
Process_____
X  Dktd_____
___ CtRmDep_____
___ Doc. No. 56

3.

Defendant Jefferson Community Correctional Center Medical Program, LLC ("JCCCMP") is the entity responsible for the health and medical care of inmates in custody at Jefferson Parish Correctional Center, per contract with Jefferson Parish. As such the program is responsible for the establishment and overall supervision of the rules, regulations, and procedures for provision of medical care to adult inmates at JPCC. The program acts as the final policymaker regarding medical procedures. It is responsible for the hiring, supervision and control of medical personnel and guards at JPCC.

4.

Defendant Dr. Joseph T. Hamrick is the Medical Director of JCCCMP. As such he is responsible for the medical care of inmates at JPCC. He is the responsible on-site health authority for JPCC and is responsible for the provision of appropriate medical care to persons incarcerated therein and for on-site supervision of medical program operations. He is also responsible for the supervision of medical program workers and monitoring of care provided to inmates by other health care personnel at JPCC. He is the final policymaker with regard to the provision of medical services to persons incarcerated in JPCC. He is sued individually and in his official capacity.

5.

Defendant Miriam Schultz, RN is the Health Services Administrator of JCCCMP. As such she is responsible for the establishment and overall supervision of the rules, regulations, and procedures for medical care to persons incarcerated at JPCC. She is the final decision-maker on administrative remedy procedures and grievances filed by patients at the facility regarding medical care. She is responsible for the provision of

appropriate medical care to inmates at JPCC and for on-site supervision of medical program operations, including screening of inmate requests and coordination of follow-up care. She is also responsible for the supervision of medical program workers and monitoring of care provided to inmates by other health care personnel at JPCC. She is sued individually and in her official capacity.

6.

Defendant doctors Richard Richoux, P. Orlando, Soeteres, L. Durante and Williams are physicians employed by JCCCMP. The Defendant physicians are responsible for the care and supervision of plaintiff and treated or failed to treat plaintiff for the complaints described herein. Defendant physicians are responsible for providing medical treatment to inmates at JPCC, including conducting and coordinating inmate medical care, providing on-call services, conferring with medical program staff regarding necessary follow-up medical care, referring inmates for evaluation and treatment as appropriate, and coordination of health care by other physicians and nurses. They are sued individually and in their official capacity.

7.

Defendant nurses Donna McGaffee, J. Llout, N. Wallace, M. Tate, T. Chisley and "R.M." are nurses employed by JCCCMP. They are responsible for the care and supervision of plaintiff and treated or failed to treat plaintiff for the complaints described herein. Defendant nurses are responsible for screening medical complaints made by inmates at JPCC, including conferring with medical program staff regarding necessary follow-up medical care, referring inmates for evaluation and treatment as appropriate,

and coordination of health care by other physicians and nurses. They are sued individually and in their official capacities.

8.

Defendant Harry Lee is Sheriff of Jefferson Parish, State of Louisiana. He is responsible for the overall proper and legal administration of the Jefferson Parish Community Correctional Center (JPCCC), including the protection of the safety and well being of the inmates incarcerated therein. As such he is responsible for the establishment and overall supervision of the rules, regulations, and procedures for adult inmates within the prison system, including classification and housing. Defendant Lee is sued individually and in his official capacity

## III. STATEMENT OF THE FACTS

8.

Plaintiff Robert Andrew Parish was arrested on December 11, 2001. He was unable to pay bail and was held at JPCC pending trial.

9.

On December 12th 2001 the medical staff at JCCMP recommended that Mr. Parish receive a bottom bunk.

10.

At that time Mr. Parish was assigned to a bottom bunk "Per JP Medical" (Attachment 1).

11.

On March 8th 2002 Mr. Parish was moved to a top bunk for "space needs"

(attachment 1).

12.

Mr. Parish was not returned to a bottom bunk until May 10th, 2002 (attachment 1)

13.

During those months Mr. Parish complained to both prison officials employed by Sheriff Lee and medical officials with JCCMP.

14.

The assignment of Mr. Parish to a top bunk caused Mr. Parish intense pain and aggravated his hiatal hernia.

15.

Sheriff Harry Lee has final decision making authority over bunk assignments. He is thus responsible for the failure to provide plaintiff a proper bunk in accordance with his physicians' orders.

16.

That Sheriff Lee had knowledge of plaintiff's condition.

17.

That the relocation of Mr. Parish to a bottom bunk represents deliberate indifference towards plaintiff's serious medical condition.

18.

At the time of intake into JPCC, Mr. Parish indicated on the JCCCMP Health Screening Form that he suffered from medical problems, including a hiatal hernia,

hypothyroidism and bipolar disorder.  Mr. Parish also provided the names of medications he was taking and contact information for his prescribing physicians and clinic.

19.

On or about December 14, 2001, defendant Dr. Richoux changed plaintiff's medications for bipolar disorder without consulting plaintiff's physicians.  Soon after, Mr. Parish requested his medications be changed back to what they were before.  He notified defendant JCCCMP that the new medications were not treating his anxiety and his increasing stress level was causing his hernia to get worse.  Defendants JCCCMP and Dr. Richoux ignored plaintiff's complaint and continued to refill the same prescriptions, and plaintiff was not re-evaluated by a physician.

20.

Beginning on or about December 14, 2001, Mr. Parish's health began deteriorating.  He made sick calls to JCCCMP every week complaining of anxiety, stabbing pain in his right side, vomiting, and other ailments.  Plaintiff's sick call complaints were screened by defendant nurses Donna McGaffee, J. Llout, N. Wallace, M. Tate, T. Chisley and "R.M."  They failed to properly triage plaintiff's complaints or to recommend he be seen by a doctor.  Defendant Doctors P. Orlando, L. Durante and Soeteres ignored plaintiff's complaints without seeing him and failed to provide or recommend appropriate medical attention.

21.

Between December 2001 and April 2002, plaintiff made at least twenty sick calls in which he complained of symptoms relating to his hernia, hypothyroidism and mental health.  Defendants failed to respond appropriately to these sick calls.

22.

Mr. Parish began experiencing painful hernia complications. Between April 4 and May 6, 2002, plaintiff wrote to JCCCMP eleven times complaining that his hiatal hernia was enlarging and becoming more painful. He asked to see a doctor and to be moved to a lower bed of a bunk bed, because climbing was painful and made the hernia worse. He did not receive any responses to these requests and was not allowed to see a doctor for 25 days.

23.

By May 6, 2002, plaintiff's hernia condition had deteriorated to such an extent that he could not even climb up and down from the top bunk of his bunk bed without tearing his stomach and suffering from extreme pain.

24.

On May 7, 2002, plaintiff filed a grievance with defendant JCCCMP, complaining that his requests for medical attention were routinely ignored. He was not moved to a lower bunk, even though his need was apparent and there was available space. The grievance was referred to defendant Miriam Schultz.

25.

On May 10, 2002, nursing supervisor defendant J. Llout responded to plaintiff's grievance determining it was "founded" and that plaintiff's medical needs required a bottom bunk. However, the response also noted that a similar recommendation plaintiff be moved to a bottom bunk had been made on April 17, but defendant JCCCMP failed to do anything about it. The response failed to address plaintiff's grievance regarding the

denial of proper medical care and failed to make an appointment for plaintiff to see a physician.

26.

During the period from April and May 2002, plaintiff's outward hernia grew from the size of a marble to the size of a baseball. The severity of his condition was apparent to the naked eye. Plaintiff made numerous verbal and written requests in sick calls for bandages and tongue depressors, supplies he used along with his shirt and a deck of cards in an attempt to bind the hernia himself, because his requests for medical help were being met with indifference. Plaintiff was experiencing severe pain due to the defendants' neglect of his condition.

27.

On June 5, 2002, plaintiff filed another grievance complaining that he had yet to see a doctor for his hernia and his condition was getting worse, including a large bulge protruding from his stomach. The grievance was referred to Miriam Schultz, but his grievance was denied by J. Llout. Plaintiff was not seen by a physician. Defendants' deliberate indifference to the serious medical needs of Mr. Parish constituted the unnecessary and wanton infliction of pain.

28.

On June 18, 2002, plaintiff began suffering from severe vomiting. He went a month without being able to retain any food or drink and vomitted regularly, including vomiting blood.

29.

In spite of plaintiff's obvious serious illness and his repeated requests for medical attention, defendant nurses failed to properly triage and refer plaintiff for evaluation and treatment, and defendant doctors continued to refuse to treat plaintiff. Defendant Dr. Williams merely told plaintiff to learn to keep his food down. The doctor refused to give further care, claiming that he could not be bothered to be a "babysitter" for patients. This response was inappropriate and deliberately indifferent under the circumstances presented which indicated serious medical need.

30.

Plaintiff submitted additional grievance complaints to Miriam Schultz, but received no medical attention for his hernia or his vomiting and inability to eat.

31.

On June 24, 2002, plaintiff went to the Medical Center of Louisiana at New Orleans ("MCLNO") (a/k/a Charity Hospital). Doctors there advised defendants that plaintiff's hernia required surgery as soon as possible. When he returned to JPCC, defendants indicated their agreement with MCLNO's recommendation. However, defendants refused to schedule surgery on a timely basis as recommended, for no appropriate medical reason and without offering appropriate alternative care.

32.

Defendants showed a wanton disregard for Mr. Parish's serious medical need by their unwillingness to help him obtain surgery or other appropriate care that they knew was required.

33.

After his return from MCLNO, plaintiff continued to suffer from severe vomiting. He lost forty-eight pounds and his blood pressure dropped. On July 3, 2002, plaintiff was given new medicine that temporarily stopped him from vomiting. However, JCCCMP discontinued the medicine shortly thereafter, for no appropriate medical reason, and without substituting any other medication to address plaintiff's vomiting.

34.

On July 13, 2002, plaintiff was admitted into the emergency room of MCLNO for severe esaphogitis. He stayed there for four days. His stomach was decompressed and he was given an intravenous dip. MCLNO doctors prescribed medical treatment and medications for esaphogitis, in addition to medications for a thyroid condition and depression.

35.

The medication recommended for Mr. Parish by MCLNO was not provided by JCCCMP through defendant doctors and supervisors, who failed to coordinate follow-up medical care for plaintiff, failed to provide appropriate care for his serious medical problems, failed to provide appropriate alternative treatment and unduly delayed treatment. Defendants were well aware of plaintiff's need, both based on MCLNO doctors' orders and plaintiff's complaints.

36.

Plaintiff began vomiting again soon after returning to JPCC from his second stay at MCLNO on July 17, 2002. On July 29, JCCCMP staff did blood work and put

plaintiff on a liquid diet. These were inadequate and grossly delayed responses to a condition that had been diagnosed as requiring surgery over a month earlier.

37.

On or about August 19, 2002, plaintiff was seen in the cardio clinic of the prison and was cleared for anesthesia and surgery for his hernia. However, despite the recommendation of surgery from doctors at MCLNO in June, and despite defendants' agreement with MCLNO's recommendation, defendants refused to allow plaintiff to have surgery at that time.

38.

On September 10, 2002, plaintiff filed the present suit for claims based on the deliberate indifference of defendants to his medical needs.

39.

On or about September 30, 2002, plaintiff went to MCLNO where his hernia was surgically repaired as recommended in June. He was told that his hernia had detached a long time ago and that surgery should have been performed much earlier. He remained hospitalized until November 5, 2002.

40.

After returning from the hospital on November 5, 2002, MCLNO doctors' orders for basic post-operative care were not followed by defendant nurses and physicians at JPCC. Doctors at MCLNO ordered internal tubes be flushed every eight hours and bandages be changed everyday. His tubes were not flushed for five days straight and his dressings were not changed for ten. The only thing keeping his dressings on his body was his shirt. Body fluids were leaking out of his tubes. Defendant doctors failed to

order, and defendant nurses failed to provide, proper follow-up care subsequent to plaintiff's surgery.

41.

During November and December 2002, plaintiff besieged defendants, including writing medical requests to JCCCMP, requesting deputies call JCCCMP, sending letters to Miriam Schultz and sending grievances to Joseph Hamrick, Miriam Schultz and JCCCMP complaining that his basic medical needs were being ignored.  These requests were met with deliberate indifference.

42.

As a result of Defendants' actions, inactions, delays and refusals to act, Mr. Parish was denied the proper and necessary medical care essential to his long-term survival and to his quality of life, and was caused unnecessary and wanton pain and suffering.  Mr. Parish has also suffered extreme emotional distress and exacerbating of his preexisting mental health condition due the seriousness of his medical condition and Defendants' neglect thereof.

## IV. STATEMENT OF THE CLAIMS

43.

The actions and inactions of Defendants at JPCC constitute negligent infliction of physical injury and intentional infliction of emotional distress in violation of Louisiana law, LSA-C.C. Art. 2315 et seq.

44.

The actions and inactions of Defendants at JPCC constitute deliberate indifference to Plaintiff's serious medical needs in violation of the Eight Amendment of the Constitution of the United States, and infliction of punishment without due process of law in violation of the Fourteenth Amendment of the Constitution of the United States.

## V. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests this Honorable Court grant the following relief:

1. Enter a declaratory judgment that Defendants have violated Plaintiff's rights as conferred by the Eighth and Fourteenth Amendments to the United States Constitution and Louisiana State Law C.C. Art. 2315, et seq;

2. Grant Plaintiff damages for violation of his constitutional rights, and for physical injury, pain and suffering, and emotional distress;

3. Award Plaintiff costs and attorneys fees as allowed pursuant to 42 U.S.C. 1988;

4. Grant Plaintiff any and all such further relief as this Court may deem proper.

Respectfully submitted,

JANE JOHNSON,  #7300
Supervising Attorney
Tulane Law Clinic
6329 Freret Street
New Orleans, Louisiana 70118
(504) 865-5153

Sent By: JPPCC; 3747708; Oct-14-02 3:43PM;

Case 2:02-cv-02655-SSV-KWR Document 56 Filed 12/11/03 Page 15 of 15

NAME: PARISH, ROBERT   D.O.B. 22-57

CHARGES: 27/30   40:1701.3   RACE W   SEX M

CCN # 173557   SOCIAL SECURITY NO. _____   AGE 44

ALIAS: _____

SPECIAL PROTECTION FEDERAL PRISONER _____

MENTAL — HOMOSEXUAL — INFORMER — SEX OFFENDER — EX-DEPUTY — CHILD ABUSER

Circle: S 1 U M RACE N W S O

| ARREST DATE | CLASS. DATE | LOCATION | BY | S | REASON |
|---|---|---|---|---|---|
| 11-16-01 | 12/11/01 | 3AL8A | RO | | |
| | 12/12/01 | 2AL8A | MED | | PER J.P. MEDICAL. |
| | 3/18/02 | 2AC9B | DPS | | SPACE NEEDED |
| | 4/3/02 | 2AL9B | | | Per Jay MEDICAL |
| | 4/8/02 | AL5B | | | Space Needed |
| | 4/26/02 | 2AR10B | CR | | Per medical nurse wallace |
| | 5-3-02 | 2AR5B | CM | | PER DR. lacy |
| | 5/10/02 | 2AR6A | DPS | | Bottom Bk Per NURSE JEAN. |
| | 5-28-02 | ND21 | MED | | SPACE NEEDED PER NURSE JEAN. |

JPSO 2.170 (Rev. 1991)

10-14-02 3:30 pm

Dr. Warnock

I obtained a copy of Mr. Parish's cell/bed movements. The location section indicates the cell, by floor, and A is an upper bunk; and B is a bottom bunk

ALL-STATE LEGAL

PLAINTIFF'S EXHIBIT
1